[No. H009525. Sixth Dist. June 11, 1993.]

WEST VALLEY-MISSION COMMUNITY COLLEGE DISTRICT, Plaintiff and Respondent, v.
DAVID A. CONCEPCION, as Arbitrator, etc., Defendant and Respondent; WINSTON H. MILLER, Real Party in Interest and Appellant.

WINSTON H. MILLER, Plaintiff and Appellant, v.
DAVID A. CONCEPCION, as Arbitrator, etc., Defendant and Respondent; WEST VALLEY-MISSION COMMUNITY COLLEGE DISTRICT, Real Party in Interest and Respondent.

## COUNSEL

Lacroix, Schumb, Sanguinetti, Keller & Schumb, Schumb & Schumb and James E. Keller for Real Party in Interest and Appellant and for Plaintiff and Appellant.

Breon, O'Donnell, Miller, Brown & Dannis, Keith V. Breon and James M. Shore for Plaintiff and Respondent and for Real Party in Interest and Respondent.

## OPINION

**WUNDERLICH, J.**—Appellant Winston H. Miller was a member of the speech department faculty at West Valley-Mission Community College District (District) until he was arrested and charged with selling cocaine on September 24, 1986. (Health & Saf. Code, § 11352.) District commenced disciplinary proceedings to discharge Miller (Ed. Code, §§ 87732, 87735), which resulted in hearings before an arbitrator acting as an administrative law judge. (Ed. Code, § 87660 et seq.)

In the criminal proceedings, Miller's first trial resulted in conviction, but the trial court granted a new trial motion based on incompetent assistance of counsel. Miller was acquitted in his second criminal trial.

After hearings in the disciplinary action, the arbitrator, David Concepcion, ruled that District's action was barred by collateral estoppel since the Committee of Credentials of the California Commission on Teacher Credentialing had determined that Miller's teaching credential should not be revoked. District appealed the arbitrator's collateral estoppel ruling by petition for a writ of mandate to the superior court. (Code Civ. Proc., § 1094.5.) The trial court granted the first petition for a writ, holding collateral estoppel was not shown, and directing the arbitrator to reconsider that issue, and also to reach the issue of Miller's fitness to teach.

On remand, the arbitrator determined that District's claim was barred by collateral estoppel, but nonetheless found that Miller was guilty of immoral conduct, but not unfit to teach, and the penalty should be one year's suspension without pay, i.e., full reinstatement except for loss of one year's pay. Both Miller and District petitioned for writs of mandate after the arbitrator's second decision. The trial court denied Miller's petition, granted District's petition, and issued a writ directing the arbitrator to order Miller's dismissal from his teaching position, with no backpay. From this ruling on the consolidated petitions for writ of mandate Miller appeals. Miller contends the trial court erred: 1) in finding the arbitrator abused his discretion in selecting a penalty and making its own penalty determination; 2) in finding Miller unfit to teach based on insufficient findings; 3) in finding proximity and impairment of relationships without sufficient evidence; 4) in taking judicial notice of the transcripts of the criminal trials; and 5) in finding Miller not entitled to any backpay, even if its ruling he should be dismissed is correct. Miller does not challenge the superior court's and the arbitrator's finding that he engaged in immoral conduct, i.e. facilitating his friend's intended cocaine sale. We affirm the judgment of the superior court for the reasons stated below.

*Facts*

Miller was arrested at his condominium by City of Santa Clara police officers on September 24, 1986, and charged with felony possession and sale of cocaine. The arrest of Miller and his friend Charles Leake (Leake) resulted from an undercover narcotics buy by a police informant, William Hogarty (Hogarty), who was cooperating with police in hopes of leniency in his own criminal case.

The condominium of Hogarty, a college student, and his roommate Richard Foust, had been searched by police pursuant to a warrant on September 16, 1986. Officers found a substantial amount of cocaine and indicia of drug dealing. Officer Chris Mackie proposed to Hogarty that if Hogarty would assist officers in setting up undercover purchases of even larger amounts of cocaine, then Mackie would urge the district attorney and the court to be lenient. Hogarty agreed to this arrangement. Hogarty was not arrested, and has not yet been charged with possession or sale of cocaine.

Leake and Miller had been friends since 1980. Between the spring of 1984 and the spring of 1985 they operated together a weight-lifting gym, "Iron Dynamics," in Mountain View. Leake lived in Los Angeles but came to the San Jose area often in connection with the gym business. While in this area, he stayed at Miller's Santa Clara condominium in a spare bedroom. He had a key to the condominium and was free to come and go as he pleased. When Leake came to visit from Los Angeles, Miller typically picked him up at the airport and let him use his (Miller's) car for transportation.

Iron Dynamics closed in the spring of 1985, about a year and a half before the arrest, due to bankruptcy. After it closed Leake did not visit the San Jose area so often. Miller also declared personal bankruptcy after the business failed.

Both Leake and Miller knew Hogarty, who was a well-known bodybuilder in the San Jose area, from Iron Dynamics. Miller did not keep in touch with Hogarty after Iron Dynamics closed. Hogarty did keep in touch with Leake in Los Angeles. During this period after Iron Dynamics closed, both Hogarty and Leake began selling cocaine. In later conversations with police Hogarty told them that Leake had offered to become his cocaine supplier.

After Hogarty agreed to become a police informant, he called Leake in Los Angeles and arranged to purchase a kilo of cocaine from him for $28,000. Leake asked Hogarty to come to Los Angeles to pick up the

cocaine, but Hogarty declined, thinking that such a plan would not suit the police. Police gave Hogarty a device to attach to his telephone which was supposed to record both sides of telephone conversations when turned on. This device did not function properly, and only recorded Hogarty's side of conversations. Hogarty had an answering machine that did record messages when he was not home.

After Hogarty called Leake, Leake called Miller. Leake told Miller that Leake was going to sell his Corvette[1] to Hogarty. Leake said he would be coming to the San Jose area to arrange the sale and wanted to make sure it would be convenient for Miller to pick him up at the airport and lend him his car, as usual. Miller stated it would be fine as long as he came down before September 22, because Miller had to be on call for jury duty starting that day.

Hogarty postponed the purchase because Officer Mackie was not available the weekend of September 20 and 21. On Monday, Miller made three calls to Hogarty, because he wanted the meeting between Leake and Hogarty to be over with before he was assigned to a jury. Hogarty was out and did not return Miller's calls. Miller called Hogarty again Tuesday morning September 23, 1986, and said, "Charlie can bring that girl up here today, and if you want to see her give me a call." Miller left his home number and his office number at the community college on Hogarty's answering machine.

When Hogarty returned Miller's calls, Miller told him to bring the money over to his house so he could count it, call Leake, and let Leake know that Hogarty did have the money and was serious. Hogarty went over to Miller's house and Miller counted his money.[2] During this tape-recorded conversation Miller said such things as: I've learned "selective counting," and that he had told Leake that "you really want to see that girl, and "you and I were going to get together this afternoon . . . ." Hogarty confirmed that Leake would bring "it" and Hogarty would bring the money and that they would make an exchange. As Hogarty was leaving Miller said, "Nobody carries a gun."

---

[1]In July, Leake had asked Miller to help him find a buyer for the Corvette, and Miller had called Hogarty to see if he was interested in buying it. Hogarty was not interested. In September, Miller believed Hogarty had changed his mind and that Leake was selling his Corvette to Hogarty, although Leake may not have mentioned the word "Corvette." Hogarty, by contrast, thought that Miller had offered to sell him cocaine in July, and declined partly because Miller had let a number of people know he was trying to reach Hogarty, and Hogarty found that conduct very indiscreet.

[2]Miller had twice before counted large sums of money for Hogarty, while Iron Dynamics was open, and had confirmed to an unknown person over the telephone that Hogarty had a certain amount of cash.

Ronald Brooks, a special agent with the state Department of Justice, Bureau of Narcotic Enforcement, testified that "girl" is a common slang term used by narcotics dealers for cocaine. Narcotics dealers almost never refer to the drug they are selling by its proper name. "Girl" and "white girl" are listed as slang terms for cocaine in the text, Drugs and Law for the Street Cop.

Leake called Hogarty and postponed the sale for a day because the quality of the cocaine was poor. The next day, September 24, 1986, Miller called Hogarty twice. The first time he said, "I haven't heard anything from down south." Later, after Miller had picked up Leake and a friend named Jeff Woods from the airport and had driven them to his condominium, he called and told Hogarty that Leake had arrived and Hogarty could come over.

Miller greeted Hogarty when he arrived at his condominium. Miller gave Hogarty an iced tea and then went upstairs to bed. After Leake produced the cocaine, Hogarty gave a prearranged signal and the police entered Miller's condominium. All four men were arrested and taken to the police station. In the condominium police found a kilo of cocaine, about one-half pound of marijuana, and a calendar with a handwritten notation "Bill Hogarty $28,000." This evidence was excluded from Miller's criminal trials because of police error, but was admitted in the arbitration. Leake testified at the hearing on Miller's new trial motion that he had not told Miller he planned to sell cocaine to Hogarty, rather he had led Miller to believe he was selling his Corvette, and this prior testimony was introduced in the arbitration.

*Discussion*

1. *Governing Law and Decisions Below*

The governing board of a community college district may seek the dismissal of a regular (tenured) employee for one of ten specific causes. (Ed. Code, § 87732.) These causes include "immoral or unprofessional conduct" and "evident unfitness for service," as well as dishonesty, incompetency, and conviction of a felony or crime involving moral turpitude, among others. (*Ibid.*) The disciplinary proceeding is heard by an arbitrator who "shall determine" whether there is cause, and if so, the precise penalty to be imposed. (Ed. Code, § 87675.) The arbitrator's decision is subject to judicial review, in which the superior court exercises its independent judgment on the evidence. (Ed. Code, § 87682.) In its amended accusation seeking dismissal of Miller, District asserted two causes, immoral conduct and evident unfitness to teach.

The California Supreme Court has interpreted the statutes involving discharge of teachers for the listed causes. Terms such as immoral conduct,

unprofessional conduct, or moral turpitude, are so general that they must be given meaning by relation to the particular profession involved. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 220 [82 Cal.Rptr. 175, 461 P.2d 375].) In other words, a teacher may have committed an immoral act, but unless it indicates his unfitness to teach, it is not an appropriate basis for discharge. (*Id.* at p. 225.) The court suggested that in determining whether a teacher's conduct indicates unfitness, the fact finder may take into account the following factors: 1) the likelihood that the conduct adversely affected students or fellow teachers; 2) the proximity or remoteness in time of the conduct; 3) the type of teaching certificate; 4) the extenuating or aggravating circumstances; 5) the praiseworthiness or blameworthiness of the motives resulting in the conduct; 6) the likelihood of recurrence of the conduct; and 7) the extent to which disciplinary action would have a chilling effect on the constitutional rights of teachers. (*Id.* at p. 229.) The court concluded that the credential of a teacher, who engaged in a single incident of noncriminal homosexual activity remote in time to the board's proceeding, should not be revoked, without a showing that the single incident indicated his unfitness to teach. (*Id.* at pp. 218-220, 239.)

The court followed its *Morrison* decision in *Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691 [139 Cal.Rptr. 700, 566 P.2d 602]. A 16-year elementary school teacher was arrested for an alleged homosexual solicitation to a police officer in a public restroom. (*Id.* at pp. 694-695.) No charges were filed, but the school board commenced proceedings to discharge the teacher for immoral conduct and evident unfitness for service. (*Id.* at p. 694.) The trial court found the teacher had solicited the officer, but determined that his conduct did not demonstrate unfitness to teach. (*Id.* at pp. 694-695.) The board of education argued that proof the teacher committed a public sexual offense demonstrated a per se unfitness to teach. (*Id.* at p. 700.) The court rejected that argument. "The per se rule that the board advocates would force the trier of fact to narrow his vision to the commission of the charged act, and compel him to ignore relevant and admissible evidence which shows that, notwithstanding the commission of that act, the teacher is presently fit." (*Id.* at p. 704.) A careful and reasoned inquiry into the teacher's fitness is mandated. (*Ibid.*)

In this matter, the arbitrator found in his second decision: 1) again, that the District's action was collaterally estopped by the credentials committee's finding that there was no cause to revoke Miller's credential; 2) that the evidence excluded from the criminal trials should be admitted in the arbitration; 3) by a preponderance of the evidence that Miller knowingly and voluntarily participated in facilitating the sale of a kilo of cocaine; and 4)

applying the *Morrison* factors, that Miller was not unfit to teach. The arbitrator ordered Miller reinstated with loss of a year's pay.

Reviewing the evidence under the independent judgment standard, the superior court ruled that the arbitrator's second and third findings (admission of evidence, knowing participation in sale of cocaine) were supported by the evidence. The court found, however, that the collateral estoppel and fitness rulings were contrary to the weight of the evidence and constituted abuses of discretion. The superior court was of the view that knowing participation in the sale of a large amount of cocaine was immoral conduct showing unfitness to teach per se. However, the court also applied the *Morrison* standards, finding: 1) Miller's conduct adversely affected students and teachers, achieved some notoriety, and irretrievably compromised his relationship with faculty and students; 2) District pursued the disciplinary proceedings close in time to the immoral conduct; 3) there were no extenuating circumstances; and 4) that Miller was unfit to teach. The court found that its independent review standard encompassed the arbitrator's whole decision, including penalty, and concluded that dismissal with no backpay was the appropriate penalty. The superior court remanded the matter to the arbitrator with directions to order Miller's dismissal without backpay, and the arbitrator complied.

## 2. Standard of Review

■ On a petition for writ of mandate following administrative proceedings to dismiss a teacher, the superior court exercises its independent judgment. (Ed. Code, § 87682.) Following the superior court's independent review, the scope of review on appeal is limited. "An appellate court must sustain the superior court's findings if substantial evidence supports them. In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court. [Citations omitted.]" (*Pittsburg Unified School Dist.* v. *Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 978 [194 Cal.Rptr. 672].)

## 3. Unfitness to Teach

■ Unfitness or fitness to teach is a question of ultimate fact. (*Board of Education* v. *Jack M., supra,* 19 Cal.3d at p. 698, fn. 3.) A finding that the teacher committed a particular immoral act may, because of the *Morrison* factors, not be inconsistent with a finding of present fitness to teach. (*Id.* at

pp. 696-699 [teacher solicited police officer to perform homosexual act, but teacher's conduct was isolated incident due to great stress he was under, there was no danger of recurrence, fellow teachers and students had not heard about teacher's conduct, teacher did not pose threat to students, therefore he was fit to teach].)

Three of Miller's contentions on appeal relate to the determination of the ultimate fact of unfitness. Miller assigns error in the trial court's findings on proximity and on impairment of relationships as based on insufficient evidence. Also, Miller attacks the ultimate determination he is unfit to teach as based on insufficient findings. We keep in mind that Miller does not attack the trial court's finding that he engaged in immoral conduct, that is, that he knowingly facilitated the sale of a kilo of cocaine.

■ Substantial evidence supports the superior court's finding that District initiated proceedings close in time to the alleged immoral conduct. Miller was arrested on September 25, 1986. District placed Miller on a compulsory leave of absence and notified him on October 3, 1986. District waited until the conclusion of the (first) criminal case to begin formal disciplinary proceedings under the Education Code, but we do not think this was an untoward delay. The proximity factor, we think, was meant to address the problem suggested by the facts of *Morrison* itself. In that case the person who had the homosexual experience with Morrison reported it to the superintendent of the school district one year later. (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 219.) Nineteen months after the superintendent found out about the incident, the board of education held a hearing regarding revocation of Morrison's teaching credential. (*Id.* at pp. 219-220.) The board revoked his credential three years after the incident occurred. (*Id.* at p. 220.) It was found to be unfair to the teacher to select an incident in the remote past and to seek his discharge on that basis. (*Id.* at p. 237.)

By contrast, in the instant case District notified Miller he was placed on compulsory leave within days after his arrest. Following the August 31, 1987, criminal conviction, District initiated the disciplinary proceedings in September 1987. By stipulation the disciplinary proceedings were held in abeyance pending completion of the second criminal trial. We think it was reasonable for District to delay until the first criminal trial was completed. The parties stipulated to further delays. The trial court's finding on proximity is supported by substantial evidence.

■ While there was conflicting evidence on this next issue, substantial evidence supports the trial court's finding that Miller's relationships with

faculty and students were impaired. Miller's arrest for selling cocaine achieved some notoriety: the news was "buzzing" around campus; the speech department and students who read the student newspaper knew of the arrest; another teacher found out at a high school speech tournament; and it was mentioned in an article in the San Jose Mercury News. Dr. Leo Chavez, president of West Valley College, testified that he believed Miller was unfit to teach. He was concerned about Miller's being involved in drug sales on campus, and drawing undesirable persons to the campus. A teacher who knowingly participated in the sale of cocaine, he believed, was not able to communicate proper values to students. Dr. Tom Green, instructional dean of science, math, communications and English at West Valley College, testified that a teacher who engaged in facilitating a sale of cocaine would not be fit to communicate proper values to students. He believed there would be a risk that the teacher would engage in such conduct again. Michael Leary, a photography instructor at West Valley, testified that a teacher who engaged in conduct such as Miller engaged in, could not be a proper role model for students. This testimony from administrators and instructors constituted substantial evidence of impairment of Miller's relationships with students and other faculty.

Miller challenges the trial court's determination of unfitness as not based on sufficient findings. Miller claims the trial court did not make the required findings on all of the *Morrison* factors, such as likelihood of recurrence, the effect of publicity, etc. *Morrison* itself says that the fact finder *may* consider the listed factors. (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 229.) We find that the superior court did not err; it considered the most pertinent *Morrison* factors and concluded correctly that Miller is unfit to teach.

First of all, the court did find that Miller's conduct had an adverse effect on students and fellow teachers (the first *Morrison* factor). The court made a finding on proximity (the second factor), and the type of teaching credential was part of the record (third factor). The court found that there were no extenuating circumstances, and by omission impliedly found that there were no aggravating circumstances either (the fourth factor). Since Miller denied the conduct, characterizing his motives as praiseworthy or blameworthy had no meaning or applicability (the fifth factor). The court was aware of the sixth factor, the likelihood of recurrence of the conduct, and believed that no one could accurately make a prediction about that. The seventh factor, chilling effect on constitutional rights, was not applicable. The court had before it the expert testimony of the educational experts on fitness, which is necessary for this determination. (*Pettit* v. *State Board of Education* (1973)

10 Cal.3d 29, 35 [109 Cal.Rptr. 665, 513 P.2d 889, 78 A.L.R.3d 1].) The superior court's findings were sufficient to support its ultimate finding of unfitness to teach.

### 4. *Taking Judicial Notice of Criminal Transcripts*

At the arbitration the parties stipulated that only excerpts from the transcripts of the two criminal trials would be admitted. Over Miller's objection the trial court granted District's motion for the court to take judicial notice of the transcripts.

The trial court did err in taking judicial notice of the transcripts. The court should only have admitted additional evidence if it could not have, in the exercise of reasonable diligence, been introduced in the arbitration. (Code Civ. Proc., § 1094.5, subd. (e).) District could have offered the full criminal transcripts in the arbitration but chose not to do so.

The error, however, was not prejudicial. The evidence before the arbitrator and the evidence introduced in the criminal trials was substantially the same, although the cocaine and the calendar were not admitted in the criminal trials. Miller's attorney stated the only difference was that there was no expert testimony on the use of the word "girl" for cocaine in the criminal trials, but that is incorrect. Clearly whether "girl" meant cocaine was at issue in the criminal trials, and Officer Mackie testified as an expert in the second trial that "girl" was a slang term for cocaine. The officer gave similar testimony in the first trial. The criminal transcripts were redundant to the administrative record, and the trial court's noticing them was harmless error. *Coombs* v. *Pierce* (1991) 1 Cal.App.4th 568, 578, 581 [2 Cal.Rptr.2d 249], on which Miller relies, is distinguishable, because without the judicially noticed evidence, the evidence was insufficient to support the findings. That was not so in the instant case.

### 5. *Penalty Decision*

Pursuant to the Education Code section 87674, the arbitrator (or administrative law judge) assumes "complete and sole jurisdiction" over disciplinary proceedings. He or she shall determine whether there is cause for discipline, and he or she shall determine "the precise penalty to be imposed . . . ." (Ed. Code, §§ 87675, 87680.) The superior court, on review, does exercise its independent judgment on the evidence. (Ed. Code, § 87682.) For purposes of the superior court's review of the arbitrator's decision, we think "decision" means the decision of whether there is cause for discipline.

Review of the penalty determination, however, traditionally differs from the review of the evidence and factual findings. The superior court

upholds the penalty determination of the agency or arbitrator, unless there has been a manifest abuse of discretion. (*Talmo* v. *Civil Service Com.* (1991) 231 Cal.App.3d 210, 227-228 [282 Cal.Rptr. 240]; *Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 501 [210 Cal.Rptr. 788].) The appellate court uses the same standard as the superior court, reviewing the arbitrator's penalty for manifest abuse of discretion. (*Id.* at p. 501.) "If reasonable minds may differ as to the propriety of the discipline imposed, the administrative decision may not be regarded as an abuse of discretion." (*Id.* at p. 504.) Ordinarily, the superior court and the appellate court may not substitute their discretion for that of the arbitrator. (See Cal. Administrative Mandamus (Cont.Ed.Bar 2d ed. 1989) §§ 4.88, 14.26, pp. 150-152, 463.)

In *County of Santa Clara* v. *Willis* (1986) 179 Cal.App.3d 1240, 1245 [225 Cal.Rptr. 244], a homosexual hospital attendant was accused of making inappropriate sexual advances to paralyzed patients and also to other hospital employees, of being insensitive to patients' needs, and of failing to do his job properly. After administrative proceedings the hospital board determined he had engaged in gross misconduct, but reinstated him without backpay. (*Id.* at p. 1249.) The superior court granted a peremptory writ of mandate, finding the board had abused its discretion and ordering it to terminate the employee. (*Ibid.*)

This court affirmed the trial court's order granting the petition for a writ, based on the singular circumstances of the case. (179 Cal.App.3d at p. 1243.) We agreed with the superior court that the hospital board had abused its discretion in reinstating Willis. (*Id.* at p. 1251.) While an administrative body has broad discretion in determining an appropriate penalty, it does not have absolute and unlimited power, but must exercise judicial discretion. We affirmed the trial court's ruling ordering the discharge of the employee. (*Ibid.*)

Miller's case is also unique and *Willis* controls. The arbitrator abused his discretion in selecting the penalty of one year's suspension. The idea of a cocaine-dealing community college instructor communicating moral standards to students is just as repugnant as a hospital aide fondling the genitals of helpless patients with spinal cord injuries. Reasonable minds cannot differ that entrusting impressionable young minds to a teacher who facilitated the sale of a kilo of cocaine would be dangerous. Reasonable minds cannot differ on the propriety of discharge as a penalty for engaging in this immoral conduct. Under the unique circumstances of this case the superior court did not err in determining the appropriate penalty.

### 6. *Backpay*

■ Miller contends that, even if the trial court's discharge order was appropriate, he is entitled to backpay. Briefly we review the facts. After Miller's arrest, District placed him on compulsory leave of absence pursuant to Education Code section 87736, on October 6, 1986, without pay. After the guilty verdict in the first criminal trial, District filed an accusation on September 18, 1987, (administrative complaint) charging Miller with conviction of a felony and unfitness to teach. In March 1989 after Miller was acquitted in the second criminal trial, District placed Miller on administrative leave, with pay. District filed an amended accusation in October 1989 and charged Miller with immoral conduct and unfitness to teach, based on Miller's facilitating the sale of a kilo of cocaine. District continued to pay Miller until December of 1991 when the superior court rendered its decision. Miller seeks backpay for the period from October 1986 to March of 1989.

District is authorized to place on compulsory leave of absence employees who have been charged with certain sex or narcotics offenses. (Ed. Code, § 87736.) District may suspend immediately a teacher who is charged with immoral conduct or conviction of a felony or of any crime involving moral turpitude. (Ed. Code, § 87735.) Unfitness for service is not a basis that supports a compulsory leave without pay.

Miller relies on *Von Durjais* v. *Board of Trustees* (1978) 83 Cal.App.3d 681 [148 Cal.Rptr. 192], for the proposition he is entitled to backpay. In that case a school employee was criminally charged with possession of peyote for sale, possession of marijuana, and cultivation of marijuana. (*Id.* at p. 684, fn. 1.) The board of education placed the employee on compulsory leave without pay. (*Id.* at p. 684.) The criminal complaint was dismissed. (*Ibid.*) The board filed an accusation seeking dismissal of the employee based on four grounds: immoral conduct, dishonesty, evident unfitness for service, and the three Health and Safety Code violations. (*Id.* at p. 684, fn. 3.) After a hearing the commission on professional competence determined that the employee had possessed marijuana, that possession of marijuana was not immoral conduct, but that the employee should be dismissed for unfitness to serve. (*Id.* at p. 685.) Since the employee was cleared of immoral conduct (which would support a suspension without pay), and since the employee was dismissed for unfitness (which does not support a suspension without pay), the court determined that the employee was entitled to backpay. (*Id.* at pp. 686-687.)

*Von Durjais, supra,* is distinguishable from the instant case because Von Durjais was not found guilty of immoral conduct. In this case Miller was

found guilty of immoral conduct, by the arbitrator and the superior court, and the finding is not challenged on appeal. Immoral conduct can support a suspension without pay. While it is true that District did not charge Miller with immoral conduct until after the second criminal case resulted in an acquittal, we find the amended accusation relates back to the filing of the original accusation. (*Smeltzley* v. *Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 934 [136 Cal.Rptr. 269, 559 P.2d 624, 85 A.L.R.3d 121].) This is so because the relief sought is based on the same general set of facts although the legal theory is different. (*Ibid.*) In the first accusation District sought Miller's dismissal because of conviction of a felony (facilitating the sale of a kilo of cocaine), and in the second sought dismissal for immoral conduct (facilitating the sale of a kilo of cocaine). The same conduct was at issue, and this immoral conduct supports the suspension without pay. That District placed Miller on administrative leave after the acquittal did not amount to his "return to service" within the meaning of Education Code section 87736. The trial court's ruling that Miller was not entitled to backpay was correct.

### *Disposition*

The judgment is affirmed.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.