Filed 8/11/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| PATRICIA CRAWFORD, | |
| Plaintiff and Appellant, | E071770 |
| v. | (Super.Ct.No. RIC1723206) |
| COMMISSION ON PROFESSIONAL COMPETENCE OF THE JURUPA UNIFIED SCHOOL DISTRICT, | OPINION |
| Defendant and Respondent; | |
| JURUPA UNIFIED SCHOOL DISTRICT, | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Randall S. Stamen, Judge.  Affirmed.

Trygstad, Schwab & Trygstad, and Lawrence B. Trygstad, Richard J. Schwab and Rosty G. Gore, for Plaintiff and Appellant.

No appearance from Defendant and Respondent.

Adams Silva & McNally, and Kerrie E. McNally, for Real Party in Interest and Respondent.

1

# I.

## INTRODUCTION

In February 2017, students at Rubidoux High School (RHS) participated in a protest. As part of the protest, almost a quarter of RHS's student body boycotted school for the day. Plaintiff and appellant, Patricia Crawford, a guidance counselor at RHS, criticized the students who boycotted in an e-mail to a colleague and by leaving several comments on a RHS teacher's public Facebook post that was similarly critical of the boycotting students. Some students and others considered the post and Crawford's comments on the post to be offensive. The Facebook post "went viral," and a public outcry against Crawford and other RHS teachers' comments ensued, resulting in nationwide media attention, a RHS student protest against the teachers, and a flurry of e-mails to RHS administration from the public.

Real party in interest, Jurupa Unified School District (the District), dismissed Crawford on the grounds that her conduct was "immoral" and showed that she was "evidently unfit for service" under Education Code section 44932.[1] Defendant and respondent, the Commission on Public Competence of the Jurupa Unified School District (CPC), upheld Crawford's dismissal, as did the trial court, and as do we. The trial court's judgment is affirmed.

---

[1] All statutory references are to the Education Code.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts*

On February 16, 2017, RHS students protested in support of "A Day Without Immigrations," a nationwide boycott that sought to illustrate the economic impact of immigrants in the United States and to protest President Donald J. Trump's immigration policies. RHS's student body is approximately 90 percent Hispanic/Latino, and about a quarter of its students boycotted attending school in support of the protest.

On the morning of "A Day Without Immigrants," another teacher e-mailed staff asking about the high rate of absences in her classes. Crawford responded, "The PROFESSIONAL staff members and SERIOUS students are here today, boycott be darned."

Later that day, RHS teacher Geoffrey Greer posted the following on Facebook: "Well. A day without immigrants. Perhaps all the missing workers in all the various industries out there had the intended impact and sent the desired message. I don't know. As for the public school system, having my class size reduced by 50% all day long only served to SUPPORT Trump's initiatives and prove how much better things might be without all this overcrowding. [¶] That's what you get when you jump on some sort of bandwagon cause as an excuse to be lazy and/or get drunk. Best school day ever." Crawford commented on Greer's post, "Cafeteria was much cleaner after lunch, lunch, itself, went quicker, less traffic on the roads, and no discipline issues today. More,

3

please."  Several other teachers made similar comments about how the protesting students' absence had positive effects, such as smaller classes, fewer "troublemakers," increasing a class's "cumulative GPA," and making instruction easier.

Two students commented on Greer's post to express their disappointment and disagreement with the post and the teachers' comments in the thread.  A student responded by saying, among other things, "[Y]ou guys are public figures and many students are taking these comments in a negative way . . . .  I myself am a son of an immigrant and I do feel as some of these comments are directed towards my cohort."  Immediately after this comment, a former RHS student said, "Let's not focus on the teachers here, a counselor, who I looked up to made a remark.  Very very disappointing."  The counselor the student was referring to was Crawford.

Within minutes, Crawford responded, "Disappointing is to think that some of my students still don't get it about education.  Staff members who are sympathetic to the cause were at school today.  The kids who care were there.  The professional staff members were there.  What I saw today was more proof, just like last year, that boycotts, especially of education, aren't the answer.  It just keeps the ones who need it the most as useful fools."

Another former RHS student responded to Crawford's comment shortly afterward. He said "[Y]ou don't understand what it feels like to have counselors that belittle what you want to be. That when you're trying to aim high, they tell you that you can't." Crawford responded directly to the student, stating "[A]ny counselor who chops you off at the knees like that shouldn't be a counselor. That's why today upset me so much. I want my students to go out there and stand proud. Education is one way to do that." Someone immediately replied to Crawford's comment with "[Crawford], in your previous statement above you said 'more please!', meaning you want more of your students to not keep coming to class like today. Why contradict yourself now?"

Crawford did not reply, but elsewhere in the post's thread, she commented a final time by saying, "And I'm the great-granddaughter of immigrants. I care. But this isn't the way to go about effecting change. My post was meant to be snarky. Get over yourselves." Crawford then logged off Facebook for the night.

Crawford subsequently received several instant messages criticizing her comments on Greer's post. Some of the messages were threatening. Greer's post "went viral" on social media and gained attention "way beyond Jurupa Valley." Several people took screenshots of Greer's post and Crawford's comments and uploaded them to Twitter, gaining dozens of "retweets," "likes," and "many, many" negative replies.

The following morning, Crawford sent an e-mail to RHS Principal Dr. Jose Araux and another RHS administrator. Crawford wrote, "Last night, on Facebook, I responded to a colleague's post with an observation, as did a few other teachers. Former students became very angry, which caught me by surprise. I responded to one of the former student's hatefulness, trying to defend myself, and ended the post with 'get over yourselves,' as in understand that my original post was a joke. I believe that that part of the comment has been reposted and taken out of context. I then started receiving threatening [instant messages]. I deleted my Facebook account. [¶] Since after the election, I can no longer eat lunch in the staff lounge because of the anti-Caucasian conversations. The environment has become very uncomfortable at RHS. Even so, I have not let the environment affect how I deal with my students. I am a professional, and I care deeply about ALL of my students. Because of the comments taken out of context, and the threats that I received via [instant message], I don't feel safe going to work today."

Greer, Crawford, and other faculty members who commented on Greer's Facebook post were put on administrative leave on the same day, February 17, 2017.

In the ensuing days, Crawford received 10 e-mails expressing disagreement with her comments. One of the e-mails read, "As a former High School counselor, I am extremely disgusted with your comments on the protest." "[T]he key to being a successful counselor is gaining the students trust and building positive relationships. You have broken their trust, and you have embarrassed your school."

The District received over 250 e-mail complaints about Greer's post and the comment thread, over 50 of which specifically referenced Crawford's comments. One said when "*teachers* and *counselors* resort to calling students and their families 'lazy', 'ignorant', 'trouble makers' and insinuate that they are . . . dirty ('cafeteria was much cleaner after lunch'), it speaks VOLUMES." Another wrote, "[i]t is disgusting to know that a COUNSELOR told these kids to, 'Get over yourselves' for what? Stating their opinions and standing up for a case that they believe in? And this is the people who you want our kids to look up to." One complainant opined that "[t]eachers are meant to inspire, teach, and be mentors. These unfit teachers showed the complete opposite. And worse can be said about the counselor. What the counselor said was even more devastating; there is no way all the rapport they built with the students will be intact. So much for the support they are supposed to give students."

The following day, RHS's campus was vandalized with graffiti on Greer's and another teacher's classrooms, which said "F**K YOU" and "F**K YOUR OPINION." About 350 students staged a "walk-out" and demonstration to protest Greer's Facebook post and the comments in the thread. Riverside County deputies were dispatched to monitor the protest, which caused the closure of Mission Boulevard, a busy street in Jurupa Valley. The students unsuccessfully tried to march onto the I-60 freeway. RHS students planned a second walk-out in the following days, but the District successfully prevented it.

7

On February 21, 2017, the District's Board held a regularly scheduled meeting. Several media outlet reporters attended the meeting, which had standing room only. The Board took public comment about Greer's Facebook thread, during which 11 people specifically referred to Crawford. No one spoke in support of Crawford or any of the involved teachers.

Numerous local and national media outlets contacted the District for comment about Greer's Facebook post. At least 11 news articles referenced Crawford's comments in the thread. The Anti-Defamation League and the Department of Justice contacted RHS's principal to offer support on how to handle the situation. The American Civil Liberties Union wrote a letter to the District, stating "[t]hese [Facebook comments] communicate that immigrant and Latino students (who comprise 91.05% of the school's student population), and the students who support them, are unwelcome in the classroom and undermine the positive school climate that is critical to student success."

In the weeks following the Facebook thread, RHS teachers scheduled lessons to address the comments. Some teachers allowed students to express their thoughts and feelings about the Facebook thread in writing.

In May 2017, the District put Crawford on paid leave and informed her that the District intended to dismiss her. Crawford timely appealed the District's decision to the CPC a month later.

In August 2017, a parent of an RHS student contacted the District to express her opinion that Crawford was not fit to teach and that students would not trust her. The parent opined that Greer, Crawford, and the other teachers who commented on Greer's Facebook post had "damaged their own effectiveness as educators, students will most likely not listen to them, and I am afraid that they will treat my son unfairly for them having to go through legal issues." The parent also believed that "if they return they will disrupt the functions of the school causing more protests or manifestations against them."

Around the same time, local media reported on the Facebook thread again, specifically discussing Crawford's comments in an article headlined "6 months later, Rubidoux High teachers still on leave for 'Day Without Immigrants' posts."

B. *Procedural History*

The District sought to dismiss Crawford for her Facebook comments because they constituted "immoral conduct" (§ 44932, subd. (a)(1)) and exhibited her "[e]vident unfitness for service" as a counselor. (§ 44932, subd. (a)(6).) Crawford appealed the District's decision to the CPC. After conducting a hearing, the CPC found, among other things, that Crawford's comments "negatively impacted students, the school, the district and the community." The CPC concluded that Crawford's conduct qualified as immoral conduct, rendered her "evidently unfit to serve," and justified her dismissal.

9

Crawford filed a petition for writ of mandate in the Riverside Superior Court under section 44945 and Code of Civil Procedure section 1094.5 challenging the CPC's decision. The trial court denied the petition, finding that the weight of the evidence supported the CPC's finding that Crawford engaged in immoral conduct and was evidently unfit to serve.

Crawford timely appealed.

## III.

## DISCUSSION

A. *Legal Principles and Standard of Review*

Section 44932 provides several grounds for the dismissal of a permanent employee of a public school district, including "immoral conduct" and "evident unfitness for service." (§ 44932, subd. (a)(1), (6).) When a school district seeks to dismiss a permanent employee, such as Crawford, for immoral conduct or evident unfitness for service, the CPC must hold a hearing to determine whether the charged conduct occurred and, if it did, what the proper remedy should be. (*Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 220 (*Burman*).)

The CPC's decision is reviewable in superior court under a petition for writ of mandate. (Code Civ. Proc., § 1094.5.) "In a proceeding on a writ of administrative mandate, 'the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' [Citation.]" (*San Diego Unified School Dist. v. Commission on Professional*

10

*Competence* (2013) 214 Cal.App.4th 1120, 1140 (*SDUSD*).)  "Though the trial court is required to exercise its independent judgment on the evidence, it is to give a 'strong presumption of correctness' to the [CPC's] findings."  (*Ibid.*)

"""After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited."  [Citation.]  We must sustain the trial court's findings if they are supported by substantial evidence.  [Citation.]  In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment.'"  (*SDUSD*, *supra*, 214 Cal.App.4th at p. 1141.)  "'If there is substantial evidence, the judgment must be affirmed.  [Citation.]  We do not reweigh the evidence.  Our inquiry "begins and ends with the determination as to whether there is substantial evidence, contradicted or uncontradicted, which will support the finding of fact.""'  (*Id.* at p. 1142.)  Our task is to "review the record and determine whether the *trial court's* findings (not the administrative agency findings) are supported by substantial evidence."  (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407-408.)  In short, we must decide "'whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [administrative agency's] findings of fact.'"  (*Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 282 (*Ricasa*).)

B. *Substantial Evidence Supports the Trial Court's Finding that the Weight of the Evidence Supported the CPC's Finding that Crawford's Conduct Was "Immoral"*

Crawford suggests there are three fixed categories of conduct that constitute "immoral conduct" as a matter of law and her conduct does not fit into any of them. We disagree. As the California Supreme Court has explained, the term "immoral conduct" in section 44932, subdivision (a)(1) "stretch[es] over so wide a range" of conduct that it "embrace[s] an unlimited area of conduct." (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 224-225 (*Morrison*).) Thus, the term must be "'considered in the context in which the Legislature considered it, as conduct which is hostile to the welfare of the general public . . . more specifically in this case, *conduct which is hostile to the welfare of the school community.*'" (*Id.* at p. 224, citing *Jarvella v. Willoughby-Eastlake City School District* (1967) 12 Ohio Misc. 288, 289, italics added; see also *Governing Board v. Brennan* (1971) 18 Cal.App.3d 396, 400 ["The Supreme Court in *Morrison* further defined immoral conduct, in quoting from *Jarvella* . . . ."].) A teacher's conduct is therefore "immoral" under section 44932, subdivision (a)(1) when it negatively affects the school community in a way that demonstrates the teacher is "unfit to teach."[2] (See *Board of Education v. Commission on Professional Competence* (1980) 102 Cal.App.3d 555, 593 [the term "immoral conduct" must be "given context by reference to fitness for the performance of that occupation"]; *Bassett Unified School Dist. v. Commission on*

---

[2] Although Crawford was a counselor, not a teacher, she does not dispute the standards and case law applicable to teachers apply equally to guidance counselors.

*Professional Competence* (1988) 201 Cal.App.3d 1444, 1453 ["[W]here charges of immorality . . . are raised in [a] teacher discharge case[], the applicable standard is whether the person is fit to teach."].)

In *Morrison*, the court outlined seven factors courts should consider "to determine whether the unprofessional conduct demonstrated unfitness to teach:  . . . [1] the likelihood that the conduct may have adversely affected students or fellow teachers, [and] the degree of such adversity anticipated, [2] the proximity or remoteness in time of the conduct, [3] the type of teaching certificate held by the party involved, [4] the extenuating or aggravating circumstances, if any, surrounding the conduct, [5] the praiseworthiness or blameworthiness of the motives resulting in the conduct, [6] the likelihood of the recurrence of the questioned conduct, and [7] the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers.'"  (*Broney v. California Commission on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 474, citing *Morrison*, *supra*, 1 Cal.3d at pp. 229-330.)  "'These factors are relevant to the extent that they assist the board in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his [or her] students are likely to meet the [school district's] standards.'"  (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1462 (*Lampedusa*).)

13

Applying the *Morrison* factors, the trial court here found that the CPC's decision was supported by the weight of the evidence. At the outset, we reject Crawford's suggestion that the trial court erred by assessing the *Morrison* factors for two reasons. First, Crawford erroneously contends the trial court failed to find whether Crawford engaged in "immoral conduct" or was "evidently unfit to service" under section 44932 before turning to the *Morrison* analysis. The trial court, however, specifically found that "the weight of the evidence supports the [CPC's] finding that [Crawford] engaged in immoral conduct" before its *Morrison* analysis. Second, the CPC's role (and by extension, the trial court's role) "is not merely to determine whether the charged conduct in fact occurred, but to decide whether that conduct—*measured against the Morrison criteria* . . . demonstrates unfitness to teach *and thus constitutes* 'immoral or unprofessional conduct' within the meaning of [section 44932, subdivision (a)(1)]." (*Burman*, *supra*, 45 Cal.3d at p. 220, italics added.)

Crawford also asserted at oral argument that applying the *Morrison* factors to assess her fitness to teach—and thus whether her conduct was "immoral conduct"—conflates the issues. In her view, we must make a "prima facie" finding of immoral conduct before addressing the *Morrison* factors. She further argued that "immoral conduct" in section 44932 should be given a colloquial interpretation that includes only

14

conduct that would be deemed "immoral" in an everyday sense, such as criminal activity and using profanity or racial epithets.[3]

We disagree. Immoral conduct "stretch[es] over so wide a range that [it] embrace[s] an unlimited area of conduct." (*Morrison*, *supra*, 1 Cal.3d at pp. 224-225.) Thus, "the proper criteria is fitness to teach" because the term "immoral conduct" is "so broad and vague" that it is "constitutionally infirm." (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 696 (*Jack M.*).)

This brings us to another point Crawford emphasized at oral argument. Crawford claims that using the *Morrison* factors to determine whether her conduct was "immoral" will allow schools to dismiss educators for virtually any statement they make. We think just the opposite. "The *Morrison* standard gives substance to the tenured teacher's right to be discharged only for cause. If the *Morrison* standards are not applied, the teacher is left essentially at the mercy of the [CPC] (or the trial court) to be discharged whenever cause exists in the subjective estimation of either body." (*San Dieguito Union High School Dist. v. Commission On Professional Competence* (1982) 135 Cal.App.3d 278, 289.) Without applying the *Morrison* factors, whether conduct is "immoral" "becomes little more than an abstract moral judgment," (*id*. at p. 284.) allowing permanent employees to be dismissed for whatever conduct the CPC deemed "immoral." (See *Morrison*, *supra*, Cal.3d at p. 229 [teacher's credential revoked for engaging in one

---

[3] We note that, although Crawford did not use any racial epithets or make any explicitly race-based comments, many people considered her statements to be derogatory toward immigrants and racist.

15

homosexual act].) *Morrison* thus ensures that a permanent employee can be dismissed for "immoral conduct" only if it shows that the employee is unfit to teach.

Crawford also suggested at oral argument that using the *Morrison* factors to determine whether her conduct was immoral will allow schools to dismiss a permanent employee because of the public's response to the employee's speech. But that is consistent with *Morrison* insofar as the public's response affects the employee's ability to teach. "Various cases have emphasized the significance of the public nature of a teacher's misconduct, or the notoriety and publicity accorded it." (*Pettit v. State Board of Education* (1973) 10 Cal.3d 29, 35 fn. 5.) Again, a permanent employee may be dismissed if the employee is "unfit to teach," and that analysis may consider public opinion if it bears on the employee's ability to teach. (See *Comings v. State Board of Education* (1972) 23 Cal.App.3d 94, 106 [affirming decision dismissing teacher in part because his "conduct attained a degree of timely notoriety among persons—students, teachers, parents, and others—interested in [the high school]"].) Considering the public's opinion of and response to an employee's conduct therefore may be appropriate when assessing whether the employee is "unfit to teach." After all, "the impact of publicity" caused by the employee's conduct is an appropriate consideration under *Morrison* because the public's response may affect a permanent employee's ability to perform his or her job. (*Burman*, *supra*, 45 Cal.3d at p. 220.)

"The clear import of [*Morrison*] . . . is that a teacher may be discharged . . . [when] his [or her] conduct . . . has gained sufficient notoriety so as to impair his [or her] on-campus relationships." (*Board of Trustees v. Stubblefield* (1971) 16 Cal.App.3d 820, 826.) That is what occurred here. Crawford was not dismissed because members of the public thought she could not teach at RHS, as she suggested at oral argument. Nor was she dismissed simply because her comments were "controversial," as she also suggested at oral argument. The District dismissed Crawford because of the adverse effect her comments had on her professional reputation, her ability to counsel students effectively, and her relationship with RHS generally. As the CPC found, Crawford's comments "negatively impacted students, the school, the district and the community."

Finally, Crawford suggested at oral argument that the *Morrison* factors do not apply because *Morrison* was a case about a teacher's credential, whereas this case is about Crawford's dismissal. The distinction is immaterial. "[W]here charges of immorality or unprofessional conduct are raised in [a] teacher discharge case[], the applicable standard is whether the person is fit to teach." (*Bassett Unified School Dist. v. Commission on Professional Competence* (1988) 201 Cal.App.3d 1444, 1453; *Haar*, *supra*, 28 Cal.App.4th at p. 385 [a teacher may be dismissed for immoral conduct that reflects unfitness to teach].) And to determine whether a teacher is "fit to teach," courts should apply the *Morrison* factors. (*Ibid.*; accord, *SDUSD*, *supra*, 214 Cal.App.4th at pp. 1149-1150 [applying *Morrison* factors to determine whether teacher could be dismissed for immoral conduct]; *Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 383-384

18

[same]; *West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1774 ["[A] teacher may have committed an immoral act, but unless it indicates his unfitness to teach [under the *Morrison* factors], it is not an appropriate basis for discharge."])  We therefore apply the *Morrison* factors to determine whether Crawford's conduct demonstrates she was "unfit to teach" and thus constituted "immoral conduct." (*Burman*, *supra*, 45 Cal.3d at p. 220.)

### 1. *Adverse Effect on Students or Teachers*

As to the first *Morrison* factor of adversely affecting students or fellow teachers, Crawford's comments had an undeniable negative effect on RHS generally and RHS students specifically.  The District received 51 e-mail complaints about Crawford, she received at least 10, and nearly 40 people complained about her Facebook comments at the February 2017 Board meeting.  The CPC heard from three RHS students who testified about how Crawford's comments affected them.  One student was "shocked" by Crawford's comments and interpreted them as accusing immigrant students of being responsible for unclean lunch areas, traffic, and discipline issues in the classroom.  That student no longer considers Crawford a role model, which is a crucial trait for guidance counselors like Crawford.  A second student testified that Crawford's comments made him "sad because she was [his] counselor."  He also does not consider Crawford a role model because he thought her comments described the immigrant students as "dirty."  He stated that he no longer wanted Crawford to be his role model because he did not "look up to her the way that [he] did."

19

A third RHS student testified that Crawford's comments "shocked" her because she did not expect her "to say that about students." Crawford's comments made her feel "weird" because she interpreted them as "[p]retty much calling . . . immigrants dirty." Like the other students who testified, she did not want Crawford to be her counselor because she did not "want someone to guide [her] with those thoughts," and did not consider Crawford to be a role model because she "wouldn't like to be like this racist person." Because of RHS students' loss of trust in Crawford, District administrators lost confidence in Crawford's ability to effectively serve as a counselor.

Finally, Crawford's comments brought significant negative media attention to RHS, which adversely affected RHS as a whole. (See *Ricasa*, *supra*, 31 Cal.App.5th at p. 286 [holding media coverage caused by teacher adversely affected school and its students].)

The record thus contains substantial evidence to support the trial court's finding that the first *Morrison* factor was satisfied. (See *Lampedusa*, *supra*, 194 Cal.App.4th at p. 1463 [school administrator's loss of confidence in teacher was substantial evidence that teacher's conduct had an adverse impact on teacher's "on-campus relationships"]; see also *Board of Trustees v. Stubblefield*, *supra*, 16 Cal.App.3d at p. 826 [teacher may be discharged when her conduct "has gained sufficient notoriety so as to impair [her] on-campus relationships"].)

## 2. *Proximity or Remoteness in Time of the Conduct*

The second *Morrison* factor considers when the teacher's conduct occurred in relation to the school's disciplinary decision. Crawford was put on administrative leave the day after she posted her comments, and the District sought to dismiss her within months. This *Morrison* factor is met.

## 3. *Type of Teaching Certificate*

The third *Morrison* factor looks to the discharged teacher's teaching certificate(s) and whether the teacher's conduct is consistent with his or her credentials and position at the school. (See *SDUSD*, *supra*, 214 Cal.App.4th at p. 1143.) The trial court noted that Crawford holds a teaching certificate and was a guidance counselor for a school that was 91 percent Latino, and found that her derogatory "comments regarding students that are immigrants or support immigrants impacts [her] ability to act as a counselor and/or teacher at RHS." The testimony of the three RHS students summarized above provides substantial evidence to support this finding and the trial court's conclusion that the third *Morrison* factor was adverse to Crawford.

## 4. *Extenuating or Aggravating Circumstances Surrounding the Conduct*

The fourth *Morrison* factor looks to whether extenuating or aggravating circumstances "bore upon [Crawford's] fitness to teach." (*Broney v. California Commission on Teacher Credentialing*, *supra*, 184 Cal.App.4th at p. 477.) Given the students' testimony and the undisputed evidence that Crawford's comments affected her ability to serve as a trusted guidance counselor, substantial evidence supports the trial

21

court's conclusion that this factor weighed against Crawford. (See *ibid.* [holding teacher's criminal conduct was an aggravating circumstance under *Morrison* because it was "'incompatible with a teacher's status and duties'"].) Further, there is no evidence of extenuating circumstances that would have justified Crawford's behavior.

### 5. *Praiseworthiness or Blameworthiness of Crawford's Motives*

The fifth *Morrison* factor considers whether the teacher's motives deserve praise or blame. Crawford contends her initial motives were to engage in a "private discussion with a small group of employees" because she thought Greer's post was private, she did not intend her comments to be viewed by students, and she intended to "stress[] the value of education." The trial court found "[t]here is no praiseworthiness in [Crawford's] motives," observing that Crawford "continued to post on Facebook after she knew that the initial Facebook posts were being viewed by the public."

As the CPC found—findings that the trial court did not dispute or reject—Crawford's "comments were discriminatory and her 'get over yourselves' comment demonstrated her utter lack of understanding or appreciation for the magnitude of her actions. At [the CPC] hearing she failed to demonstrate any insight for what she had done, take any real ownership for her actions, or exhibit any empathy for the students or community she harmed. In short, her presentation was underwhelming." These findings provide substantial evidence supporting the trial court's conclusion that the fifth *Morrison* factor did not weigh in Crawford's favor.

### 6. *The Likelihood of the Recurrence of the Questioned Conduct*

The trial court found as to the sixth *Morrison* factor of the likelihood Crawford's misconduct would reoccur, that "[t]he weight of the evidence supports [the CPC's] finding that it is likely similar questionable conduct may occur due to [Crawford's] lack of remorse or acceptance of wrongdoing," particularly given that Crawford "made no effort to apologize for her posts until the [CPC] hearing." Coupled with the CPC's agreement that Crawford "likely . . . will engage in this behavior again" given her "underwhelming" performance at the hearing, we conclude substantial evidence supports the trial court's conclusion that the sixth *Morrison* factor did not weigh in Crawford's favor. (See *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [CPC's findings are entitled to "strong presumption of correctness"]; *SDUSD*, *supra*, 214 Cal.App.4th at p. 1142 [under substantial evidence review, appellate court "cannot substitute its deductions for those of the superior court"].)

### 7. *Chilling Effect Upon Constitutional Rights*

The trial court did not make a finding on the seventh *Morrison* factor, which evaluates whether the disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers. On appeal, Crawford raises a host of arguments as to why this factor was met. In the trial court, however, Crawford effectively conceded the issue. Crawford's entire argument on this *Morrison* factor was that, "[a]lthough [she] may not have a constitutional right to post on Facebook, she should not lose her job over a mistake. There is not even a District policy

or rule about posting on Facebook." Crawford provided no additional argument in her reply.

By failing to adequately brief the seventh *Morrison* factor and essentially conceding the issue in the trial court, Crawford has waived her right to raise the issue on appeal. (See *366-386 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1199 ["However, real parties failed to adequately raise this issue in the superior court, and it may not be raised for the first time on appeal."]; see *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 436 [holding argument made in trial court pleading in a footnote as a "placeholder" without "any authority, evidence, or analysis" was waived on appeal]; see also *Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 ["In civil cases, constitutional questions not raised in the trial court are considered waived."].) Regardless, we need not resolve whether the seventh *Morrison* factor weighs in Crawford's favor because substantial evidence supports the trial court's findings that the six other *Morrison* factors weigh against Crawford, which was sufficient for the trial court to uphold the CPC's decision. (See *Woodland Joint Unified School Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1457 [holding *Morrison* factors "taken in the aggregate" supported finding of unfitness for service].)

In brief, a *Morrison* factor analysis shows that there is substantial evidence to support the trial court's "ultimate finding" that Crawford is "unfit to teach" and, in turn, the trial court's finding that Crawford engaged in immoral conduct under section 44932,

subdivision (a)(1).  (*Jack M.*, *supra*, 19 Cal.3d at p. 698, italics omitted; *Burman*, *supra*, 45 Cal.3d at p. 220 [conduct that reflects unfitness to teach "constitutes 'immoral or unprofessional conduct' within the meaning of [section 44932, subdivision (a)(1)."].)  We therefore need not address the trial court's conclusion that the District properly dismissed Crawford because she was evidently unfit to serve under section 44932, subdivision (a)(6).  (See *Ricasa*, *supra*, 31 Cal.App.5th at p. 439 [appellate court did "not address the remaining two bases for her demotion and express[ed] no opinion on them" because substantial evidence supported decision to terminate professor for immoral conduct].)

C.  *The District's Decision to Dismiss Crawford*

Crawford contends that, even if her conduct was immoral, her dismissal was an excessive penalty.  We conclude the CPC did not abuse its discretion in upholding the District's dismissal of Crawford.

Because of the CPC's expertise, its decision as to the appropriate penalty for Crawford's immoral conduct is entitled to great deference.  (*San Dieguito Union High School Dist. v. Commission on Professional Competence*, *supra*, 135 Cal.App.3d at p. 288.)  "'[A] disciplinary discharge often involves complex facts and may require a sensitive evaluation of the nature and seriousness of the misconduct and whether it warrants the grave sanction of dismissal.'  [Citation.]"  (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 343-344.)  The CPC thus "has broad discretion in determining . . . whether dismissal or suspension is the appropriate sanction."  (*Id.* at p. 343.)  We must affirm the CPC's decision to uphold Crawford's dismissal unless it was

25

"a manifest abuse of discretion."  (*Ricasa*, *supra*, 31 Cal.App.5th at p. 286.)  For that reason, "'"[i]f reasonable minds may differ as to the propriety of the discipline imposed, the [CPC's] decision may not be regarded as an abuse of discretion."'"  (*Ibid*.)  "Only in an exceptional case will an abuse of discretion be shown because reasonable minds cannot differ on the appropriate penalty."  (*County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877.)

The CPC upheld the District's decision to dismiss Crawford for her Facebook comments and her "underwhelming" performance at the CPC hearing.  The CPC correctly observed that "[a]n educator may be dismissed if the conduct has gained sufficient notoriety so as to impair his or her on-campus relationships."  (See *Board of Trustees v. Stubblefield*, *supra*, 16 Cal.App.3d at p. 826 ["[A] teacher may be discharged . . . [when] his conduct . . . has gained sufficient notoriety so as to impair his on-campus relationships."]; see also *Comings v. State Board of Education* (1972) 23 Cal.App.3d 94, 106 [affirming decision dismissing teacher in part because his "conduct attained a degree of timely notoriety among persons—students, teachers, parents, and others—interested in [the high school]"]; *Jack M.*, *supra*, 19 Cal.3d at p. 701, fn. 5 ["*Morrison* mentioned the absence of notoriety as one ground for its conclusion that the record did not demonstrate teaching unfitness; other decisions have confirmed the relevance of this consideration."].)

As our analysis of the *Morrison* factors above shows, Crawford's conduct gained significant notoriety, including nationwide media attention, which negatively affected her relationships with RHS's students, administration, and community. Given the public outcry and the loss of confidence in her abilities as a counselor among RHS students, parents, and administrators, it is "evident that [Crawford's] conduct was 'detrimental to the mission and functions of [her] employer.' [Citation.]" (*Lampedusa*, *supra*, 194 Cal.App.4th at p. 1465.)

"While reasonable minds may differ as to whether [Crawford's] conduct, even viewed in its entirety, was sufficiently egregious to warrant the harsh treatment of dismissal versus progressive discipline," the CPC reasonably concluded that her dismissal was appropriate under the circumstances. (*Governing Board v. Haar*, *supra*, 28 Cal.App.4th at p. 385.) On this record, the CPC's decision was not an abuse of discretion. (See *ibid.*; *Board of Trustees v. Stubblefield*, *supra*, 16 Cal.App.3d at p. 826; *Comings v. State Board of Education*, *supra*, 23 Cal.App.3d at p. 106.)

In sum, we conclude (1) substantial evidence supports the trial court's finding that Crawford's conduct rendered her unfit to teach under the applicable *Morrison* factors, and (2) the CPC did not abuse its discretion in concluding her dismissal was appropriate. We therefore affirm the trial court's ruling denying Crawford's petition for writ of mandate.

IV.

DISPOSITION

The trial court's ruling is affirmed.  The District shall recover its costs on appeal.

CERTIFIED FOR PUBLICATION

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.