Filed 3/2/21  Jaimes v. Cal. Com. on Teacher Credentialing CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| JUAN M. JAIMES, | B291851 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS170161) |
| v. | |
| CALIFORNIA COMMISSION ON TEACHER CREDENTIALING, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Reversed.

Trygstad, Schwab & Trygstad, Lawrence B. Trygstad and Richard J. Schwab for Plaintiff and Respondent.

Xavier Becerra, Attorney General of California, Linda K. Schneider, Senior Assistant Attorney General, Antoinette B. Cincotta, Supervising Deputy Attorney General, Theodore S. Drcar, Deputy Attorney General for Defendant and Respondent.

———————————

# INTRODUCTION

The California Commission on Teacher Credentialing (Commission) appeals from a judgment granting a petition for writ of mandate directing the Commission to set aside its decision to revoke the teaching credential of Juan Jaimes as a penalty for his misconduct and to "impose some lesser penalty that lies within its discretion."  The Commission argues its exercise of discretion to revoke Jaimes's credential is subject to de novo review and the trial court erred in ruling it had abused that discretion in revoking Jaimes's credential.  We reverse.

## FACTUAL AND PROCEDURAL HISTORY

A.      *Background*

1. *Leon Takes Jaimes's Geometry Class*

Jaimes was born in Mexico in 1974 and immigrated to the United States in 1988.  He graduated from Valley High School in Santa Ana, where he met Brenda Jaimes.[1]  Brenda and Jaimes married in 1998.  In 2002, Jaimes graduated from California State University Fullerton with a degree in mathematics.  In 2002, the Commission issued a "Single Subject Teaching Credential" to Jaimes.  In September 2002, the Santa Ana Unified School District (Santa Ana District) hired Jaimes to teach math at Valley High School.  He taught math for seven years at Valley High School until his resignation in 2009.  In 2006, Jaimes and Brenda, who had two children, separated and filed for dissolution of their marriage.  They reconciled in 2007.

---

[1]      We refer to Brenda Jaimes by her first name to avoid confusion.

Jenny Leon was born in Mexico in January 1988, and came to the United States in September 2003 when she was 15 years old.  Leon lived in Arizona with her father and attended high school there.  In June 2005, when she was 17 years old, Leon moved to Santa Ana and lived with her grandmother.  Leon's aunt enrolled Leon in Valley High School for the 2005-2006 school year as a junior.  During that year, Leon worked afternoons and weekends at a swap meet to earn money to pay for her food and rent.

During her junior year, Leon enrolled in Jaimes's geometry class.  Jaimes's relationship with Leon was no different than his relationships with the other 40 students in the geometry class.  Leon turned 18 years old in January 2006.  Leon was Jaimes's student until June 2006, when the school year ended.

2. *Jaimes and Leon Become Romantically Involved*

In summer 2006 between her junior and senior years, Leon continued to work at the swap meet.  In July 2006, Jaimes encountered Leon while she was working at the swap meet.  During this time, Jaimes was separated from Brenda.  A week or two weeks later, Jaimes returned to the swap meet and asked Leon if she wanted to get something to eat.  Leon agreed, and they ate lunch at the swap meet's food court.  Leon told Jaimes that she was 18 years old and asked him his age.  Jaimes told her and also said that he was separated from his wife  After two months of dating, their relationship became intimate and sexual.  Leon introduced Jaimes to her grandmother and aunt.  Although Jaimes considered it "risky," Jaimes and Leon had unprotected sex.  Jaimes told Leon that he could get in trouble "if their

3

relationship was discovered." After Leon fell in love with Jaimes, Leon told Jaimes that she wanted to get married.[2]

On August 31, 2006, Leon transferred from Valley High School to Saddleback High School, also within the Santa Ana District. Leon testified that she transferred based on "convenience." To travel from her home to Valley High School, Leon took three buses, while attending Saddleback only required her to take one bus from home to school. During her senior year, Leon worked at the swap meet full time on weekends and after school on school days. Leon and Jaimes continued to see each other during the school year.

### 3. *Jaimes and Leon Separate After Leon Becomes Pregnant*

In October 2006, after learning she was pregnant, Leon informed Jaimes. The relationship between Leon and Jaimes ended some time during Leon's senior year, before their child was born. After they separated, Leon "no longer wanted to continue the communication" with Jaimes. Jaimes would sometimes "bother" Leon at work.

Leon stopped working "a month or a month and a half" before she gave birth. Leon gave birth to her son in June 2007, shortly after she graduated from high school. In 2007, after Leon filed a child support claim against Jaimes, Leon obtained an order garnishing his wages in the amount of approximately $700 per month. Leon testified that "it was better just to have that money transferred instead of [her] having to be calling [Jaimes]."

---

[2] During the summer of 2006, Jaimes taught at Valley High School.

4

In 2007, Jaimes and Brenda reconciled, and they had a third child together.  Jaimes continued to teach at Valley High School.

### 4. *Jaimes Resigns, Separates Again from Brenda, and Marries Leon*

On July 22, 2009, a "concerned citizen" sent the Santa Ana District a letter titled "HS TEACHER CHASING HS GIRL STUDENTS."  The letter alleged that Jaimes had a sexual relationship with Leon and that Leon had his child.  The letter asked:  "What kind of example is he teaching to his students?  How many other girls are getting good grades for sex exchange?  Investigate and stop him."

On July 29, 2009, the Santa Ana District Executive Director confronted Jaimes.  After meeting with an attorney, on July 31, 2009 Jaimes submitted his resignation.  When Jaimes told Leon that he had resigned from his teaching position, Jaimes asked if Leon had sent the anonymous letter.  Leon told Jaimes that she did not send the letter.  Jaimes blamed Leon for having to resign from his teaching position.  Jaimes told Leon "that because of what had happened, his job was taken from him."  After his resignation, Jaimes taught school in Georgia for a year and a half.  After he returned to California, Jaimes taught in other school districts.

Jaimes lived with Brenda until 2011, and again beginning in May 2012.  In approximately 2014 Jaimes and Leon became romantically involved again.  In November 2014, Jaimes and Brenda divorced.  Jaimes and Leon married in March 2015.  As of November 2016, Jaimes and Leon lived together with their nine-year-old son.

5

B.     *Commission Proceedings*

1. *The Commission Has Jurisdiction Over Teaching Credentials*

The Commission establishes the professional standards for obtaining teaching credentials in California.  (Ed. Code, § 44225.)[3]  The Commission reviews and revises the code of ethics for teaching professionals.  (§ 44225, subd. (c).)  The Commission also has the responsibility to take adverse action as to any credential; the Commission may "privately admonish" or "publicly reprove" the credential holder, or "revoke" or "suspend" a credential for "immoral or unprofessional conduct" or "for evident unfitness for service."  (§ 44421.)  The Commission appoints a seven-member committee (Committee) to investigate allegations of misconduct against those who hold a teaching credential.  (§§ 44240; 44242.5, subd. (e).)  If the Committee receives information about a credential holder, the Committee may conduct a preliminary review.  At the conclusion of this review, the Committee may either end the review or instruct staff to set the matter for an initial review.  (Cal. Code Regs., tit. 5, § 80308.)  The initial review commences when a credential holder is notified that his fitness to hold a credential is under review.  (§ 44242.5, subd. (c); Cal.Code Regs., tit. 5, § 80307.1.)  No later than six months after the initial review commences, a formal review is held.  (§ 44244 subd. (b).)  At the formal review, the Committee determines either that no adverse action should be taken or that the allegations are sufficient to cause the credential holder to be subject to adverse action.  (*Ibid.*)

---

[3]     All undesignated statutory references are to the Education Code.

6

The Committee makes a probable cause determination at the formal review.  If there is no probable cause, the investigation is terminated.  (§ 44242.5, subd. (c)(3)(A).)  The Committee reports to the Commission its findings as to probable cause and its recommendation as to the appropriate adverse action. (§ *Id.,* subd. (e)(1).)  The Committee must send its recommendation to the credential holder within 14 days. (§ 44244, subd. (d).)  If there is probable cause, the credential holder may request an adjudicatory hearing pursuant to the provisions of the Administrative Procedure Act.  (§ *Id.*, subd. (c)(3)(B).)  The Commission may adopt the recommendation of the Committee without further proceedings if the credential holder fails to request an administrative hearing. (§ 44244.1, subd. (a)(1).)

If the credential holder gives notice of intent to request an administrative hearing in response to the Committee's probable cause recommendation, the Commission files "an accusation or statement of issues" to "initiate an adjudicatory hearing." (§ 44242.5, subd. (c)(3)(B).)  The administrative adjudication as to the credential is subject to the rules and procedures of the Administrative Procedure Act.  (Gov. Code, § 11501, subd. (b)(58).)

2. *The Commission Files an Accusation*

In November 2012, the Santa Ana District informed the Commission that Jaimes had resigned from his teaching position while under investigation.[4]  In August 2013, the Commission

---

[4]    The Commission's regulations required the Santa Ana District to report Jaimes's resignation to the Commission within

7

sent a letter to Jaimes informing him that the Commission was conducting an initial review of his fitness to "hold a credential" based on his alleged "inappropriate relationship with a former female student . . . ."

On December 30, 2013, the Committee notified Jaimes that it "found probable cause to recommend revocation" of his teaching credential. After Jaimes requested an administrative hearing, the Commission filed an accusation against Jaimes on February 3, 2015. The accusation stated: "During the 2005-2006 school year [Leon] was enrolled in [Jaimes's] Geometry class at Santa Ana Valley High School. During the 2006-2007 school year, [Leon] transferred to Saddleback High School. From 2006 to 2007, [Jaimes] had ongoing sexual relations with [Leon]. As a result of her sexual relationship with Jaimes, [Leon] was impregnated and had a child . . . on or about June [ ], 2007. [Jaimes] paid [Leon] approximately $700.00 monthly in child support of [the child]." On July 13, 2015, Jaimes served a notice of defense to the charges in the accusation.

### 3. *The Administrative Hearing*

#### a. *The Commission's witnesses*

In November 2016, an administrative law judge held hearings regarding the accusation. Mark McKinney, the Santa Ana District Associate Superintendent of Human Resources, testified that there is a trust that school districts build and maintain in their communities. McKinney testified: "There's a trust that school districts, Santa Ana included, has to build and maintain in the community. Parents send their kids to school to

---

30 days after the final employment action. (Cal. Code Regs., tit. 5, § 80303, subd. (a).)

be educated, to be treated well.  Teachers are and school sites act as a parent when those kids are there."  McKinney testified that a romantic relationship between a teacher and student has significant adverse impacts in the school community.  McKinney explained:  "When there is a romantic relationship between a teacher and a student, it certainly clouds the mind of the student.  There's an ethical line that cannot be crossed between teacher and student.  When that line is crossed, that creates confusion for the student . . . which can potentially impact their academic as well as their social aspect and those kinds of things.  For the teacher to cross that line, that's a significant impact, not only for themselves, but for their profession or any other teacher that might be on site.  There is a standard of that relationship between the student and a teacher."  In explaining the adverse impact on the educational community, McKinney added:  "When [a teacher] develop[s] that personal relationship with a student, in this case a romantic relationship that is clearly an inappropriate relationship and that creates an impact [on the] trust and value that the parent has with that teacher[,] with that school site and eventually the District."

McKinney further testified that the adverse impacts become even more complicated and difficult when the relationship between the teacher and the student is sexual and a pregnancy results.  When the teacher is married, there is an adverse impact on the school community's perception of the teacher's moral character.  McKinney testified that the ethical problem is not diminished if the teacher is separated from his or her spouse.  According to McKinney, it also makes no difference whether the student and teacher are in the same school or the student is 18 years old.

Chad Hammit, the Santa Ana District Executive Director of Human Resources, testified that many students view their teachers as role models. Hammit explained: "Students are definitely impacted by their teacher's conduct. And students look up to and admire their teachers and look to them really as models. And many of the students make choices, career choices, et cetera, based upon what they see their teachers do and how they interact with their teachers. So the role of a teacher and teacher's conduct is very important to a student." According to Hammit, teachers are held to an "ethical standard." He testified: "That ethical standard would be the expectations that they would stand up to or represent themselves in a way that would be a model for the students and present to the students what the student should strive to be as they mature and as they grow and as they continue to reach adulthood."

Hammit further testified that the Santa Ana District expected teachers to respect the line between being professional and becoming too personal with a student. Hammit testified that a teacher dating a student crosses that line. Hammit added that the line is crossed "[e]ven if it didn't go to that level, just being a student's friend and not being their teacher and the model for them." In explaining that neither a consensual relationship nor a student's age changes this problem, Hammit testified: "Because it still is the breaking of that important confidential relationship . . . of student to teacher, and the importance of that teacher being a model for the community and for the students of upright and . . . moral living." In concluding that a romantic relationship between a teacher and a student "degrades" the teaching profession, Hammit added: "If you have ever worked at a school, you know the network of conversations that go on in the teacher's

10

lounge or in the parking lot and across the school. An incident like that would spread like wild fire, and it would definitely impact the entire teaching staff of not just that school but the District."

Stephanie Sachs testified she worked as a counselor at Saddleback High School. Sachs explained the adverse impacts that a visibly pregnant student in high school confronts. She testified that other students might feel uncomfortable around the pregnant student and might view that student as "easy to have sex with." Sachs also testified, "Some students might feel like it's okay to be pregnant if the student is [pregnant]." Sachs further testified the impact on other students is aggravated if the students learn that the father of the child was a married teacher. According to Sachs, the fact that the teacher was separated from his spouse at the time he impregnated the student would not diminish the impact on other students. Sachs testified that beginning in May 2007 Leon took part in Teen Parent Independent Study, a program for pregnant students in which they do not attend school but study on their own.[5]

Laura Brodie, a clinical and forensic psychologist, testified as an expert witness for the Commission. Brodie testified that there is a "power differential" between a student and a teacher. Brodie explained: "It means that as a teacher, you're coming across as an authority figure, much like a parent. . . . So a student can be impacted by the power that person has being a teacher. As an older individual, many young females are enamored with an older man and an older man likes the

---

[5]     Leon denied that she was in independent study while at Saddleback High School.

attention that he gets from a young female." Brodie concluded that Jaimes had the power in the relationship with Leon based on "[h]is age and his job." According to Brodie, Jaimes engaged in "professional misconduct" because he engaged in a romantic relationship with a student. Brodie explained: "[I]t is similar . . . to a therapist-client relationship, that once you're established that there's a power differential, it can be very violating to change that into something else." When asked whether Jaimes had the potential for repeating his misconduct, Brodie opined that "past behavior predicts future behavior." She testified that in trying to predict the future, we "have that data point and that data point has to be given some weight."

### b. *Jaimes's witnesses*

Jaimes testified that he believed that he had the right to date Leon because "she was an independent adult . . . . She was 18 living on her own basically." Jaimes also testified that he never received notice of a policy that he could not date an adult student who was attending another school. When asked if it was his understanding that as long as a "student was 18, a teacher can have a romantic relationship with a student," Jaimes replied: "Well, now in 2016, no. You know, after listening to the administrators from Santa Ana Unified School District [testify], you know, [his] employer back in 2009, and [he] didn't know of it, that that was the case in 2006, but now [he knows]."

When asked if he regretted his conduct with Leon, Jaimes responded yes and no. Jaimes testified: "Well, this romantic relationship brought [him] and [his] family hardships, financial instability all this time, problems. [He] never realized how costly it is, . . . with all the stress. And on the other hand, [he has] a family, . . . a lovely wife, and . . . she is the love of [his] life."

12

When asked if he had regrets other than the effect on his family and his finances, Jaimes testified: "If [he] knew it was going to be this stressful . . . if [he] knew this was going to bring, . . . all these consequences, [he] wouldn't have done it in the first place." Jaimes testified that, other than his relationship with Leon, he had never been accused of any kind of improper conduct with a student.

Brenda testified that Jaimes had "good moral character" and that Jaimes has been a "good father" to their children. Brenda also submitted a letter to the Commission in which she stated: "[Jaimes] is a good teacher and in my opinion a good role model for many kids. . . . He made a mistake, he has learned from it and [she was] 100% sure that he has not and would not do that again. Everyone deserves a second chance, a second chance to learn from something negative, put it behind and get a new start. [Jaimes] is not a threat to any child and if he is allowed to continue teaching he would continue to be a great teacher and be able to make a difference in many kids' lives."

Al Ortega, a math teacher at Valley High School, also submitted a letter in support of Jaimes to the Commission. Ortega stated: "Mr. Jaimes [was] dedicated, respectful, knowledgeable and committed to the students, staff and community of [V]alley High School. [¶] . . . [¶] For seven years Mr. Jaimes served the Santa Ana Unified School District, the students and families of Valley's High School with distinction, and was widely respected by administrators, his fellow teachers, his students and parents. . . . [¶] He is a good teacher and a good role model. . . . [I]f allowed to continue teaching he would make a difference in many of our kids' lives. . . . Mr. Jaimes would not do

anything that would make the [C]ommission regret allowing him to keep his credential."

C.    *The Commission Revokes Jaimes's Credential*

In December 2016, the administrative law judge issued a proposed decision in which the judge recommended dismissing the accusation because the allegations were not timely presented to the Committee under section 44247.7, subdivision (a). In a meeting in February 2017, the Commission rejected the administrative judge's proposed decision. The Commission reviewed the hearing transcripts and related documents and issued a decision and order dated June 23, 2017. In its decision, the Commission concluded that clear and convincing evidence "overwhelmingly established" Jaimes "engaged in immoral and unprofessional conduct," "committed acts involving moral turpitude," and "demonstrated evident unfitness to teach." As a penalty, the Commission revoked Jaimes's teaching credential.

In its 15-page decision and order, after the Commission found "cause exist[ed] under section 44421 to impose an adverse action against [Jaimes's teaching credential] on grounds of unprofessional conduct, immoral conduct, conduct constituting moral turpitude, and evident unfitness for service," the Commission applied the factors set forth in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*) to determine whether "an adverse action should be imposed."[6] The

---

[6]    The Commission incorporated the *Morrison* factors into its regulations. The regulation provides: "(1) The likelihood that the conduct may have adversely affected students, fellow teachers, or the educational community, and the degree of such adversity anticipated; [¶] (2) The proximity or remoteness in time of the conduct; [¶] (3) The type of credential held or applied for by the

14

Commission found that "the [Santa Ana District] witnesses [McKinney, Hammit, and Sachs] and the Commission's expert witness, Dr. Laura Brodie, all testified that there is a likelihood that [Jaimes's] conduct adversely affected students, fellow teachers, or the educational community. . . . [T]he adverse impact is not limited to the 2005-2006 and 2006-2007 school years. The sexual relationship had an inherent adverse impact on [Leon] because she had to finish her high school education while pregnant with [Jaimes's] child. [Jaimes] not only harmed [Leon], but knowledge of [Jaimes's] relationship with a student would influence the way the other students view [Jaimes] in his role as their teacher as well as the school environment in general."

The Commission further found: "The risk, fear, or suspicion of a sexual relationship between a teacher and a student in an educational environment is extremely detrimental to all parties involved in the educational system, and is entirely contrary to the growth and educational experience [Jaimes] was credentialed to provide. Moreover, [Jaimes's] abuse of his trusted position as a teacher fosters a lack of trust in him as a teacher such conduct adversely impacts fellow teachers, students, and the educational community as a whole."

---

person involved; [¶] (4) The extenuating or aggravating circumstances surrounding the conduct; [¶] (5) The praiseworthiness or blameworthiness of the motives resulting in the conduct; [¶] (6) The likelihood of the recurrence of the questioned conduct; [¶] (7) The extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the person involved, or other certified persons; [¶] (8) The publicity or notoriety given to the conduct." (Cal. Code Regs., tit. 5, § 80302, subd. (a).)

Regarding when the misconduct occurred, although the events occurred in 2006 and 2007, the Commission found: "[T]he nature of the conduct is such that the length of time that has passed does not negate the deep connection between the misconduct and respondent's role as a teacher. The testimony of the [Santa Ana District] witnesses and Dr. Brodie supports the Commission's position that the passage of time does not negate the adverse impact of [Jaimes's] misconduct. . . . It is also asserted that the misconduct is ongoing in that those who learn of the nature of [Jaimes's] relationship with [Leon] will continue to be negatively impacted. Finally, given the very serious nature of this misconduct, the passage of time is of little import."

Regarding the type of credential held, the Commission found, "This credential exposes [Jaimes] to a young, highly suggestible audience that is vulnerable to [Jaimes's] advances. His teaching credential provides [Jaimes] with the ability to exert influence over and act as a role model for teenage students at the cusp of maturity. Placing [Jaimes] in a position of authority over suggestible teenage girls puts this population at risk for the same sort of misconduct of which [Leon] was a victim. More importantly, sexual conduct with a student is unacceptable for any teacher, regardless of the credential held." Regarding aggravating or mitigating factors, the Commission stated: "In aggravation, [Jaimes] was still legally married to [Brenda] and had two children with her when he entered into a sexual relationship with [Leon]." In mitigation, the Commission stated, "[Jaimes] did eventually marry [Leon]. However, it appears that they were married approximately five weeks after [Jaimes] received the Accusation in this case, which appears to indicate that the marriage was entered into to aid [Jaimes's] case." The

16

Commission found Jaimes's conduct "blameworthy" because he was "a married man who began a sexual relationship with a student that resulted in her pregnancy."

As to the likelihood of recurrence, the Commission found: "The likelihood of recurrence exists because [Jaimes] during his testimony continued to deny that his sexual relationship with [Leon], while he was a teacher and she was a student was inappropriate. [Jaimes] testified that he believed it was okay to date [Leon] because she was an adult. [Jaimes] further testified that he regrets his sexual relationship because 'it's not worth it,' not because it is inherently wrong for a teacher to have such a relationship with student. [Jaimes] also failed to acknowledge the likely adverse impact such a relationship has on the educational community. His failure to gain insight or acknowledge responsibility for his action shows lack of remorse or rehabilitation and increases the likelihood of recurrence. Given the nature of the misconduct in question here, any possibility of recurrence is unacceptable." Finally, the Commission found that there was no adverse impact on Jaimes's constitutional rights and that there was no evidence of publicity. The Commission explained: "[T]here is no constitutional right at issue when a teacher has a sexual relationship with a student while he is married."

The Commission concluded that it "has a duty to exercise its independent judgment in this matter and finds [Jaimes's] misconduct to [be] unprofessional and immoral." The Commission continued: "The evidence at hearing showed that (1) [Leon] was enrolled in [Jaimes's] geometry class at Valley High School during the 2005-2006 school year; (2) during the summer of 2006, [Jaimes] approached [Leon] while she was working at the

17

swap meet/mall and initiated a sexual relationship with [Leon]; (3) [Jaimes's] sexual relationship with [Leon] continued while [Leon] was a [Santa Ana District] student and [Jaimes] was a [Santa Ana District] teacher during the 2006-2007 school year; (4) as a result of [Jaimes's] sexual relationship with [Leon], [Leon] was impregnated and had [Jaimes's] child . . . on or about June [ ], 2007; and (5) [Jaimes] was married to [Brenda]" from January 1998 to 2014.

D.    *Proceeding in the Trial Court*

On July 13, 2017, seeking to set aside the Commission's decision and order, Jaimes filed a verified petition for writ of mandate in the Superior Court pursuant to Code of Civil Procedure section 1094.5.  Jaimes argued that the Commission committed a prejudicial abuse of discretion.  According to Jaimes, the Commission lacked jurisdiction because it failed to timely assert the allegations against Jaimes and that the Commission's decision and findings were not supported by the weight of the evidence.  Jaimes also argued that the Commission's decision violated his "right to associate with and marry an adult under the United States and California constitutions."  On July 21, 2017, the trial court granted Jaimes's ex parte application and stayed the Commission's decision and order to revoke Jaimes's teaching credential.

In its order dated May 17, 2018, the trial court recognized: "[T]he court may not overturn a penalty unless there has been a manifest abuse of discretion . . . and cannot substitute its discretion for that of the agency on the policy involved or the degree of punishment."  Therefore, the trial court stated that it must "accept the importance of the ethical policy against teacher-student romantic relationships as articulated by [the Santa Ana

18

District's] witnesses, and willingly does so." The trial court found: "[Jaimes] knowingly violated that policy and deserves sanction. But this is not a case where a school district fired a teacher for an ethical breach. The Commission has revoked [Jaimes's] credential to teach at all, thereby denying him his livelihood. Revocation might have been supportable in 2007, but at this late date it is a manifest abuse of discretion." In granting the writ of mandate, the trial court ruled: "A writ shall issue directing the Commission to set aside its decision to revoke [Jaimes's] credential and impose some lesser penalty that lies within its discretion."

In reaching its decision that the Commission abused its discretion in revoking Jaimes's credential, the trial court evaluated the evidence in light of the *Morrison* factors and determined whether each factor "weigh[ed] in favor of discipline." The trial court agreed with the Commission's evaluation of certain factors and disagreed with the Commission's conclusions as to other factors. For example, in discounting the Commission's conclusion that "the passage of time does not negate the deep connection between the misconduct and [Jaimes's] role as a teacher," the trial court stated: "The Commission's conclusion has some weight, but the fact remains that an eight year period elapsed between the misconduct and the [a]ccusation filed on February 3, 2015 and almost a decade before the November 2016 hearing. [Jaimes's] son from his relationship with Leon was 9 years old at the time of the hearing. This delay lies at the feet of [the Santa Ana District] and cannot be brushed off as being of little import. It is likely that no teacher or student at Valley High School or Saddleback High School remembers Leon, and probable that few, if any, remembers Jaimes. [¶] The

19

remoteness factor significantly undermines the level of discipline."

The trial court "agree[d] [that] the unprotected sex and pregnancy is an aggravating factor. There is an additional aggravating factor that [Jaimes] was aware of the policy against teacher-student romantic relationships. He told Leon that they could get in trouble if their relationship was discovered." However, the trial court found "other mitigating factors." According to the trial court, "First and foremost, Leon was 18 years old at the time the relationship began and was a consenting adult. Jaimes committed no crime; he is guilty only of unethical and unprofessional conduct."

The trial court further explained its reasoning: "[Jaimes] is guilty of ethical misconduct in entering into a romantic relationship with a student. The student was an adult and at another high school. His ethical misconduct was aggravated by the fact that he impregnated her and left her to birth and raise her child. This misconduct may have warranted credential revocation had the Commission acted anytime near the events in 2006-07. Due to [the Santa Ana District's] failure, the Commission did not act for another eight years. In the interim, [Jaimes] had worked in high schools both in Georgia and California without incident and married Leon. These facts count."

The Commission timely appealed.

## DISCUSSION

### A.     *Contentions*

The Commission argues that its "exercise of discretion is subject to de novo review, and this court should vacate the judgment because the Commission acted within its discretion

20

when it decided to revoke the teaching credential." The Commission further argues that the "superior court erroneously imposed its values about the seriousness of Mr. Jaimes'[s] sexual conduct" because "administrative agencies have broad discretion . . . in determining the appropriate penalty to be imposed." Jaimes, on the other hand, argues, "[I]n ruling that the Commission's decision to revoke Mr. Jaimes'[s] credentials was an abuse of discretion, the Superior Court made findings of fact including when the Court applied the *Morrison* Standards. These findings must be accepted on appeal because they are supported by substantial evidence." Jaimes further argues, "What is before this honorable court is whether there is substantial evidence to uphold the Superior Court's Judgment."

>    B.    *The Commission's Decision To Revoke Jaimes's*
>           *Credential Was Not a Manifest Abuse of Discretion*

>          1.  *Standard of Review*

"'[I]n a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.'" (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217; accord, *Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46; *West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1778-1779.) In reviewing an issue regarding the propriety of administrative discipline imposed, the appellate court employs the same "abuse of discretion" standard as the trial court. (*County of Los Angeles v. Civil Service Com. of County of Los Angeles,* (2019) 40 Cal.App.5th 871, 878; *Hanna v. Dental Bd. Of California* (2012) 212 Cal.App.4th 759, 764 [an appellate court will not disturb an administrative agency's exercise of discretion regarding whether

21

a proper discipline was imposed absent a showing of a manifest abuse of discretion]; *Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 217 ["[i]n reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court"]; Code Civ. Proc., § 1094.5, subd. (b).)

"''"Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.  [Citation]" [¶] "In reviewing the exercise of this discretion we bear in mind the principle 'courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.'" [Citation.]  'The policy consideration underlying such allocation of authority is the expertise of the administrative agency in determining penalty questions.'" (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 633, italics omitted.) "'Only in an exceptional case will an abuse of discretion be shown because reasonable minds cannot differ on the appropriate penalty." (*Crawford v. Commission on Professional Competence of the Jurupa Unified School District* (2020) 53 Cal.App.5th 327, 344 (*Crawford*); accord, *County of Los Angeles v. Civil Service Com. of County of Los Angeles, supra,* 40 Cal.App.5th at p. 877.) "'The fact that reasonable minds may differ as to the propriety of the penalty imposed fortifies the conclusion that the administrative body acted within the area of its discretion.'" (*Cate v. California State Personnel Board* (2012) 204 Cal.App.4th 270, 284; see also *Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 107 [trial court errs when it second-guesses an

agency's decision that discharge was warranted]; *Szmaciarz v. State Personnel Bd.* (1978) 79 Cal.App.3d 904, 921 [even where the court believes the penalty is too harsh, it cannot interfere with an agency's imposition of a penalty].)

In *Crawford*, *supra*, 53 Cal.App.5th 327, a guidance counselor at a high school posted derogatory comments on social media criticizing students who protested President Trump's immigration policies. (*Id.* at pp. 331-332.) After the counselor's social media post "went viral," there was a public outcry against the guidance counselor and several teachers, resulting in national media attention and a further student protest. (*Id.* at p. 331.) The school district also received numerous complaints about the counselor's comments. (*Ibid.*) Pursuant to the applicable statute, the school district dismissed the counselor on grounds that her conduct was "immoral," and "showed that she was 'evidently unfit for service.'" (*Ibid.*) After the counselor appealed her dismissal, the school district's commission on professional competence found that the counselor's comments "'negatively impacted students, the school, the district and the community.'" The commission concluded that the counselor's "conduct qualified as immoral conduct, rendered her 'evidently unfit to serve,' and justified her dismissal." (*Id.* at p. 335.) The trial court denied the counselor's petition for writ of mandate. (*Id.* at p. 337.)

In rejecting the counselor's argument that her dismissal was "excessive" punishment, the court held: "Given the public outcry and the loss of confidence in her abilities as a counselor among [the high school's] students, parents, and administrators, it is "evident that [the counselor's] conduct was 'detrimental to the mission and functions of [her] employer.'" (*Crawford*, *supra*,

23

53 Cal.App.5th at p. 345.)  The court continued, ""While reasonable minds may differ as to whether [the counselor's] conduct, even viewed in its entirety, was sufficiently egregious to warrant the harsh treatment of dismissal versus progressive discipline," the [commission] reasonably concluded that her dismissal was appropriate under the circumstances." (*Ibid*.)  The court held that the commission did not abuse its discretion "in concluding her dismissal was appropriate." (*Ibid*.)

In *West Valley-Mission Community College Dist. v. Concepcion, supra,* 16 Cal.App.4th 1766, a teacher at a community college was arrested and charged with selling cocaine.  Although the teacher was acquitted in a criminal trial, the community college commenced a disciplinary administrative proceeding to discharge the teacher.  In that proceeding, the administrative law judge found the teacher had committed "immoral conduct" under the applicable Education Code provision and imposed a one-year suspension without pay penalty. (*Id*. at p. 1770.)  In granting the community college's petition for writ, the trial court ruled the teacher's "knowing participation in the sale of a large amount of cocaine was immoral conduct showing unfitness to teach per se."  The trial court ordered the teacher dismissed without back pay. (*Id*. at p. 1775.)

After the court of appeal held that the trial court's findings were sufficient to support its conclusion of unfitness to teach, in addressing the penalty, the court pointed out that it "uses the same standard as the superior court, reviewing the [administrative law judge's] penalty for manifest abuse of discretion."  The court held the administrative law judge "abused his discretion in selecting the penalty of one year's suspension." (*West Valley-Mission Community College Dist. v. Concepcion,*

24

*supra,* 16 Cal.App.4th at p. 1779.)  The court held that the "idea of a cocaine-dealing community college instructor communicating moral standards to students" was "repugnant."  The court explained:  "Reasonable minds cannot differ that entrusting impressionable young minds to a teacher who facilitated the sale of a kilo of cocaine would be dangerous.  Reasonable minds cannot differ on the propriety of discharge as a penalty for engaging in this immoral conduct.  Under the unique circumstances of this case the superior court did not err in determining the appropriate penalty."  (*Ibid*.)

### 2.  *The Commission Did Not Abuse Its Discretion*

After the Commission found that cause existed "under section 44421 to impose an adverse action" against Jaimes's teaching credential on grounds of "unprofessional conduct, immoral conduct, conduct constituting moral turpitude, and evident unfitness for service,"[7] the Commission considered the *Morrison* factors to determine the appropriate punishment.  (Cal. Code Regs., tit. 5, § 80302.)[8]  Based upon its weighing of the

[7]    The trial court likewise found that Jaimes engaged in misconduct.  Jaimes did not appeal the trial court's findings as to his misconduct.  The only issue is whether the Commission abused its discretion in revoking Jaimes's teaching credential.

[8]    In *Morrison, supra,* 1 Cal.3d 214, the California Supreme Court articulated factors relevant to a teacher's unfitness to teach.  To establish a teacher is unfit to teach, the Supreme Court in *Morrison* required a nexus between government employment and alleged employee misconduct based on the principle that "[n]o person can be denied government employment because of factors unconnected with the responsibilities of that employment."  (*Id.* at p. 234; see *Watson v. Superior Court* (2009) 176 Cal.App.4th 1407, 1416 ["[t]he

evidence under *Morrison* factors, the Commission revoked Jaimes's teaching credential. In the Commission's view, the "very serious nature of [Jaimes's] misconduct" warranted credential revocation. While he was married to Brenda and had two children, he began a romantic relationship with Leon, a student who had just taken Jaimes's math class. Jaimes knew that he should not enter into a romantic relationship with Leon, but he proceeded to have unprotected sex with her. After Leon became pregnant, Jaimes and Leon separated and Leon obtained a child support order against Jaimes. Although the credential revocation penalty is harsh, these facts do not present the exceptional case in which reasonable minds cannot differ. The Commission's decision to revoke Jaimes's teaching credential was within its discretion.

At the administrative hearing, the Commission established that school districts "build and maintain" trust within their school communities and that teachers play a central and visible role in creating that trust among students, parents, and the educators. The ethical and moral manner in which a teacher conducts himself or herself is important. Students view teachers, such as Jaimes, as role models, and parents place their trust in

---

[Supreme Court in *Morrison*] concluded the State Board of Education cannot abstractly characterize the conduct in the case as 'immoral,' 'unprofessional,' or 'involving moral turpitude' within the meaning of [the teacher disciplinary statute] unless that conduct indicates the [teacher] is unfit to teach"].) As stated, the Commission has adopted the *Morrison* factors in its regulations for determining "the relationship between the alleged misconduct and the applicant's or holder's fitness, competence, or ability to effectively perform the duties authorized by the credential." (Cal. Code Regs., tit.5, § 80302, subd. (a).)

school districts and teachers to properly educate their children. The teacher is also an authority figure, much like a parent. (See *Board of Trustees v. Stubblefield* (1971) 16 Cal.App.3d 820, 824 ["'[a] teacher . . . in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the [students] coming under [his] care and protection'"].) Jaimes's sexual relationship with Leon crossed the ethical boundary between teacher and student. The Commission reasonably concluded that Jaimes abused his "trusted position as a teacher." The Commission presented evidence that Jaimes's conduct degraded the teaching profession. Jaimes's conduct also adversely impacted Leon. She was pregnant for much of her senior year in high school and gave birth shortly after she graduated. She had to obtain a child support order against Jaimes. The Commission established that a sexual relationship between a teacher and a student was "extremely detrimental to all parties involved in the educational system. . . ." It is reasonable to infer that Jaimes should have anticipated these consequences.

The Commission further properly concluded that Jaimes's "failure to gain insight or acknowledge responsibility for his action[s] show[ed] lack of remorse or rehabilitation and increases the likelihood of recurrence." Jaimes continued to deny that his relationship with Leon was inappropriate. He believed that "it was okay to date [Leon] because she was an adult." Jaimes never acknowledged "the likely adverse impact" of his sexual relationship with Leon on the educational community. According to Jaimes, the only negative impacts of his conduct were on his finances and his family. The Commission also reasonably found that Jaimes's teaching credential exposed him "to a young, highly

27

suggestible audience" that would be "vulnerable" to his advances and that sexual conduct with a student is "unacceptable for any teacher, regardless of the credential held." The Commission also reasonably found that there was no "praiseworthiness" associated with Jaimes's conduct because Jaimes "was a married man who began a sexual relationship with a student that resulted in her pregnancy."

It was also proper for the Commission to conclude that "the passage of time [was] of little import" because "the nature of the conduct is such that the lengthy time that has passed does not negate the deep connection between the misconduct and [Jaimes's] role as a teacher." The Commission found that Jaimes's "misconduct is ongoing" because those who learn of Jaimes's sexual relationship with Leon "will continue to be negatively impacted." In the Commission's view, the fact that Jaimes has taught in the intervening years without incident did not diminish the ethical boundary between a student and a teacher that Jaimes crossed with Leon. As a mitigating factor, the Commission took in account that Jaimes later married Leon.

While reasonable minds may differ as to whether the penalty of credential revocation was the appropriate sanction for Jaimes's misconduct, the Commission acted within its discretion in revoking Jaimes's teaching credential. (*Crawford, supra,* 53 Cal.App.5th at p. 345 [courts defer to agency's expertise when reviewing penalties because the issues ""often involves complex facts and may require a sensitive evaluation of the nature and seriousness of the misconduct and whether it warrants the grave sanction of dismissal""]; see also *Ackerman v. State Personnel Bd.* (1983) 145 Cal.App.3d 395, 401 ["There are certain professions which impose upon persons attracted to them, responsibilities

and limitations on freedom of action which do not exist in other callings. Public officials such as judges, policemen, and school teachers fall into such a category'"].)

Although the trial court recognized that it could not "substitute its discretion for that of the agency . . . on the degree of punishment," the trial court impermissibly reweighed the evidence under the *Morrison* factors and rejected the Commission's conclusion about the penalty. Although the trial court found that "[r]evocation might have been supportable in 2007," it ruled "at this late date it is a manifest abuse of discretion" to revoke Jaimes's teaching credential and directed the Commission to "impose some lesser penalty." We agree with the Commission that the trial court "cannot substitute its opinion about the appropriate discipline in the place of the agency's." Therefore, the trial court erred in finding an abuse of discretion. (See *Spanner v. Rancho Santiago Community College Dist.* (2004) 119 Cal.App.4th 584, 591 ["[w]hen the superior court has conducted its review and has concluded that the agency properly found misconduct, the imposition of the appropriate penalty for that misconduct is left to the sound discretion of the agency"].)

Based on *Pasadena Unified School District v. Commission on Professional Competence* (1977) 20 Cal.3d 309 (*Pasadena Unified*) and *Broney v. California Commission on Teacher Credentialing* (2010) 184 Cal.App.4th 462 (*Broney*), Jaimes argues that we review the trial court's judgment under a substantial evidence standard. Jaimes is incorrect. The issue here is review of the Commission's penalty determination. As stated, "Review of the penalty determination . . . traditionally differs from the review of the evidence and factual findings. The superior court upholds the penalty determination of the agency or

29

arbitrator, unless there has been a manifest abuse of discretion. [Citations.] The appellate court uses the same standard as the superior court, reviewing the arbitrator's penalty for manifest abuse of discretion." (*West Valley-Mission Community College Dist. v. Concepcion, supra*, 16 Cal.App.4th at pp. 1778-1779.)

The language in *Pasadena Unified, supra,* 20 Cal.3d 309 and *Broney, supra,* 184 Cal.App.4th 462 on which Jaimes relies pertains to whether the teacher engaged in actionable misconduct. For example, in *Pasadena Unified*, the agency found that the school district violated its own procedures and therefore "lacked cause" to dismiss the teacher. After the school district filed a writ for petition of mandate, the trial court "reached the same conclusion." (*Id.* at p. 311.) Under these circumstances, the California Supreme Court held that "[a]n appellate court must sustain the superior court's findings if substantial evidence supports them." (*Id.* at p. 314.) The only issue in *Pasadena Unified* was whether the teacher had engaged in any misconduct. Similarly, the court in *Broney* did not hold that the appellate standard of review of an agency's penalty determination is whether substantial evidence supported the trial court's judgment. Here, the only issue under review is the penalty Commission's decision. There was no dispute that Jaimes committed actionable misconduct.

30

## DISPOSITION

We reverse the trial court's order granting the petition for writ of mandate and the judgment.  We direct the trial court to enter a new order and judgment denying the petition for writ of mandate.  The Commission shall recover its costs on appeal.


DILLON, J.[*]


We concur:


PERLUSS, P. J.


FEUER, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.